EXHIBIT

NO.

1

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————

No. 14-13754

———————————

D.C. Docket No. 8:14-cr-00055-SDM-EAJ-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CARLINGTON CRUICKSHANK,

Defendant - Appellant.

———————————

Appeal from the United States District Court
for the Middle District of Florida

———————————

(September 20, 2016)

Before MARCUS and WILLIAM PRYOR, Circuit Judges, and DAVIS,[*] District
Judge.

MARCUS, Circuit Judge:

———————————

[*] Honorable Brian J. Davis, United States District Judge for the Middle District of Florida, sitting
by designation.

On February 11, 2014, the U.S. Coast Guard recovered 171 kilograms of cocaine from a vessel known as the "Venus" in international waters in the Caribbean Sea. Carlington Cruickshank, one of two men aboard the vessel, was later convicted and sentenced to 324 months' imprisonment for one count of conspiracy to possess with intent to distribute five kilograms or more of cocaine while aboard a vessel, in violation of 21 U.S.C. § 960(b)(1)(B)(ii) and 46 U.S.C. §§ 70503(a), 70506(a) and (b), and one count of aiding and abetting possession with intent to distribute five kilograms or more of cocaine while aboard a vessel, in violation of 18 U.S.C. § 2, 21 U.S.C. § 960(b)(1)(B)(ii), and 46 U.S.C. §§ 70503(a), 70506(a). On appeal, Cruickshank argues that: (1) jurisdiction did not exist to prosecute him under the Maritime Drug Law Enforcement Act ("MDLEA") and, moreover, the MDLEA is unconstitutional; (2) the district court erred in denying his motion for judgment of acquittal based on insufficient evidence of mens rea; (3) the district court erred by establishing jurisdiction under the MDLEA by relying on a United States Department of State certification, and by removing from the jury the factual question concerning jurisdiction; and (4) the district court clearly erred in denying him a minor-role reduction under U.S.S.G. § 3B1.2(b). After careful review of the parties' briefs and the record, and having had the benefit of oral argument, we affirm in part, and vacate and remand in part.

I.

First, we reject Cruickshank's claims that jurisdiction did not exist to prosecute him under the MDLEA and that the MDLEA is unconstitutional. We review a district court's interpretation and application of a statute concerning its subject-matter jurisdiction de novo, but we review factual findings with respect to jurisdiction for clear error. United Sates v. Campbell, 743 F.3d 802, 805 (11th Cir.), cert. denied, 135 S. Ct. 704 (2014). We review the legal question of whether a statute is constitutional and constitutional objections de novo. Id. Under our prior precedent rule, we are bound to follow a prior binding precedent unless and until it is overruled by us sitting en banc or by the Supreme Court. United States v. Vega-Castillo, 540 F.3d 1235, 1236 (11th Cir. 2008).

The MDLEA prohibits knowingly or intentionally possessing a controlled substance, with the intent to distribute, onboard any vessel subject to the jurisdiction of the United States. 46 U.S.C. § 70503(a)(1) ("While on board a covered vessel, an individual may not knowingly or intentionally . . . possess with intent to manufacture or distribute, a controlled substance."). It was enacted under Congress's authority provided by the Felonies Clause, U.S. Const. Art. I, § 8, cl. 10, to define and punish felonies committed on the high seas. Campbell, 743 F.3d at 805. Pursuant to the MDLEA, "a vessel without nationality" is "subject to the jurisdiction of the United States" and it defines a stateless vessel as including "a

3

vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed." 46 U.S.C. § 70502(c)(1)(A), (d)(1)(A).

In Campbell, the United States Coast Guard had intercepted the defendant while aboard a vessel in the international waters off the eastern coast of Jamaica. 743 F.3d at 804. The vessel lacked all indicia of nationality: it displayed no flag, port, or registration number. Id. Although one of the individuals aboard the vessel claimed it was registered in Haiti, the government of Haiti told the Coast Guard that it could neither confirm nor deny the registry. Id. Campbell, the defendant, argued that Congress had exceeded its authority under the Felonies Clause of the Constitution when it enacted the MDLEA. We disagreed, recognizing that "we have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause." Id. at 809-10. As we explained, a criminal act does not need a nexus to the United States in order to be criminalized under the MDLEA "because universal and protective principles support its extraterritorial reach." Id. at 810. In other words, because the Felonies Clause empowers Congress to punish crimes committed on the high seas, and because "the trafficking of narcotics is condemned universally by law-abiding nations," we rejected the argument "that it is fundamentally unfair for Congress to provide for the punishment of persons apprehended with narcotics on the high

seas." Id. (quotations omitted). This is especially true, we explained, when vessels on the high seas "are engaged in conduct that has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems." Id. (quotations omitted).

We also explained in Campbell that the "Due Process Clause of the Fifth Amendment does not prohibit the trial and conviction of an alien captured on the high seas while drug trafficking." Id. at 812 (citing United States v. Rendon, 354 F.3d 1320, 1326 (11th Cir. 2003)). In our view, the MDLEA "provides clear notice that all nations prohibit and condemn drug trafficking aboard stateless vessels on the high seas." Id.

In this case, all of Cruickshank's arguments concerning the MDLEA are foreclosed by our prior precedent. In Campbell, we reaffirmed that Congress did not exceed its authority by enacting the MDLEA; we determined that no jurisdictional nexus was required under the MDLEA; and we concluded that convictions under the MDLEA do not violate the Due Process Clause of the Constitution. See id. at 809-10, 812. Because we are bound by our prior precedent concerning all of Cruickshank's challenges to the MDLEA, his arguments necessarily fail.

II.

We are also unpersuaded by Cruickshank's claim that the district court erred in denying his motion for judgment of acquittal based on insufficient evidence of mens rea. We review de novo whether sufficient evidence supports a conviction, drawing all reasonable factual inferences from the evidence in favor of the verdict. United States v. Beckles, 565 F.3d 832, 840 (11th Cir. 2009). Evidence is sufficient if a reasonable trier of fact could have found that it established guilt beyond a reasonable doubt. Id. In rebutting the government's evidence, a defendant must do more than put forth a reasonable hypothesis of innocence, because the issue is whether a reasonable jury could have convicted, not whether a conviction was the only reasonable result. Id. at 840-41.

To establish a conspiracy, the government must prove beyond a reasonable doubt that two or more persons entered into an unlawful agreement to commit an offense, that the defendant knew of the agreement, and that he voluntarily became a part of the conspiracy. United States v. Tinoco, 304 F.3d 1088, 1122 (11th Cir. 2002); United States v. Alvarez, 837 F.2d 1024, 1027 (11th Cir. 1988). The defendant's presence on a vessel, though not determinative, is a material factor supporting his participation in a conspiracy relating to that vessel. Tinoco, 304 F.3d at 1122-23. "A defendant's presence becomes more significant when the value of the contraband is high, as it is highly improbable that drug smugglers

6

would allow an outsider on board a vessel filled with millions of dollars worth of

contraband." Id. at 1123 (quotation omitted).  When we review a conspiracy or a

possession-with-intent-to-distribute conviction involving a vessel laden with

narcotics, we consider, among other things: (1) the probable length of the voyage;

(2) the size of the contraband shipment; (3) the necessarily close relationship

between captain and crew; (4) whether the contraband was in plain view, could be

smelled, or was in a place where a person on a vessel would ordinarily discover it;

and, (5) other factors, including diversionary maneuvers designed to evade

detection and apprehension, attempts to flee, inculpatory and false exculpatory

statements made after apprehension, witnessed participation as a crewman, and the

absence of supplies or equipment necessary to the vessel's intended use. Id.;

United States v. Cruz-Valdez, 773 F.2d 1541, 1546-47 (11th Cir. 1985).

"In order to convict a defendant for possession with intent to distribute a

controlled substance, the government must prove knowing possession and an intent

to distribute." United States v. Camacho, 233 F.3d 1308, 1317 (11th Cir. 2000).

The law recognizes that a defendant may constructively possess a controlled

substance if he exercises some measure of control over the contraband, either

exclusively or in association with others. Tinoco, 304 F.3d at 1123.  The

defendant's intent to distribute may be inferred from a variety of factors, including

whether the government seized a large quantity of controlled substances. Id.  In

order to prove that the defendant aided and abetted an offense, the government must establish that: (1) someone else committed the substantive offense; (2) the defendant committed an act that contributed to and furthered the offense; and (3) the defendant intended to aid in the commission of the offense.  Camacho, 233 F.3d at 1317.

After thoroughly reviewing this record, we are satisfied that the evidence was sufficient to establish beyond a reasonable doubt Cruickshank's criminally culpable mens rea or state of mind to convict him on both charges -- conspiracy to possess with intent to distribute five kilograms or more of cocaine while aboard a vessel, and aiding and abetting possession with intent to distribute five kilograms or more of cocaine while aboard a vessel.  Among other things, Cruickshank's co-defendant, Carlos Acosta, testified that Cruickshank was one of two individuals who had been hired to transport drugs on a vessel from Colombia to Jamaica. Acosta said that, when he met Cruickshank and told him drugs were on the boat, Cruickshank stated that he was comfortable with that.  The other individual who was supposed to show up to assist with the operation did not, leaving only Acosta and Cruickshank to transport the drugs.  Acosta admitted that Cruickshank arrived after the cocaine had been loaded onto the Venus, so Cruickshank had nothing to do with loading the cocaine onto the vessel, reconstructing the Venus to carry the drugs, fueling, or attending any of the meetings leading up to the trip.  Acosta said,

however, that Cruickshank programmed the vessel's GPS devices with Acosta's help. In so doing, they configured the GPS devices to transport the ship and the contraband across the Caribbean Sea from Colombia to Jamaica, with waypoints near Jamaica. According to Acosta, once they reached the waypoint closest to Jamaica, someone was going to meet them and take the drugs.

As for their capture, Acosta said that he and Cruickshank had become concerned during the trip when they realized a Coast Guard helicopter was flying above the Venus. They eventually stopped the vessel when the Coast Guard fired warning shots. Before a Coast Guard officer from a nearby vessel boarded the Venus, they threw grocery items, garbage, and clothes overboard in an attempt to get rid of evidence that they were coming from Colombia, and one of the men took off articles of clothing and washed. Cruickshank suggested that they tell the Coast Guard that he and Acosta were searching for another vessel, but they did not decide who would admit to being in charge.

Ian Groom, a lieutenant with the U.S. Coast Guard, and Andre Trinidad, a machinery technician specializing in counter-drug enforcement with the Coast Guard, also testified. Lieutenant Groom explained that in the pre-daylight hours of February 11, 2014, he had been co-piloting a Coast Guard helicopter when he acquired visibility of a vessel operating without navigational lights. Groom noticed the vessel stopping and starting, and, after spotting the helicopter, the

vessel increased its rate of speed and the two people onboard began throwing overboard unidentified objects, which appeared to be clothing, a bucket, and a jug of water. Officer Trinidad, who was aboard a vessel that Lieutenant Groom had directed to the Venus, testified that he then boarded the Venus to question the occupants. Trinidad relayed that, in response to his questions, Cruickshank said that he was in charge and that the vessel was Jamaican. Trinidad asked for documentation to support that the boat was Jamaican, but there was no supporting documentation. Cruickshank also told Trinidad that they had left Jamaica to assist a friend who had run out of gas, and were planning to return to Jamaica. Cruickshank said that they had not found the friend, and he did not identify the friend or the name of his vessel. Trinidad contacted his supervisor, and Trinidad was eventually informed that Jamaica was not accepting the claim of nationality. At that point, Trinidad's supervisors made a request to assimilate the vessel without nationality, which meant U.S. law would be imposed and the vessel would be subject to all U.S. laws.

Trinidad testified that the captured vessel was the Venus, and that Cruickshank and Acosta were on board. Trinidad also said that a scan performed on the Venus tested positive for cocaine, and that he found hidden kilogram-size packages of cocaine after drilling a hole in a bench on the vessel. Ultimately,

authorities found a handheld GPS device, a handheld two-way radio, and approximately 171 kilograms of cocaine on the Venus.

As the evidence at trial showed, while Cruickshank was on the Venus, it operated without lights, it attempted evasive maneuvers when the Coast Guard helicopter was overhead, and the occupants threw items overboard to conceal their starting point. Evidence also revealed that Cruickshank had said he was comfortable with the drugs being on the boat, he programmed the vessel's GPS devices, he came up with a cover story for the authorities, and he ultimately told the Coast Guard that he was in charge and gave the false statement about why they were at sea. There was more than sufficient evidence to establish Cruickshank's guilt beyond a reasonable doubt on both charges.

III.

We are also unpersuaded by Cruickshank's claims that the district court erred by establishing jurisdiction under the MDLEA in two respects: (1) by relying on a United States Department of State certification, in violation of the Confrontation Clause of the Constitution; and (2) by removing from the jury the question of fact concerning jurisdiction, in violation of Alleyne v. United States, 570 U.S. ___, 133 S. Ct. 2151 (2013). Normally, we review whether hearsay statements are testimonial de novo. United States v. Caraballo, 595 F.3d 1214, 1226 (11th Cir. 2010). But if a defendant (like Cruickshank) did not raise an

objection based on his confrontation right at trial, we review a confrontation claim

for plain error.  United States v. Charles, 722 F.3d 1319, 1322 (11th Cir. 2013).  To

show plain error, the defendant must establish (1) an error, (2) that is plain or

obvious, and (3) that affected his substantial rights.  United States v. Turner,

474 F.3d 1265, 1276 (11th Cir. 2007).  And, if a defendant satisfies these three

conditions, we may exercise our discretion to recognize the error only if it

"seriously affects the fairness, integrity, or public reputation of judicial

proceedings."  Id.  An error is plain when it contradicts precedent from the

Supreme Court or our Court directly resolving the issue.  See United States v.

Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003).  "Errors [] affect a substantial

right of a party if they have a 'substantial influence' on the outcome of a case or

leave 'grave doubt' as to whether they affected the outcome of a case."  Turner,

474 F.3d at 1276 (quotation omitted).  But "where the effect of an error on the

result in the district court is uncertain or indeterminate," the defendant has not met

his burden of demonstrating prejudice for purposes of plain error review.  United

States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir. 2005).  And, finally, as we

said earlier, we review constitutional issues de novo.  Campbell, 743 F.3d at 805.

The Sixth Amendment's Confrontation Clause prevents the admission of a

witness's testimonial statement when the witness does not appear at trial, unless he

is unavailable to testify and the defendant had a prior opportunity to cross-examine

him. Id. at 806. However, a United States State Department certification of

jurisdiction under the MDLEA does not implicate the Confrontation Clause

because it does not affect the guilt or innocence of a defendant. See id. at 806-09.

In Alleyne, the Supreme Court revisited two of its prior cases: (1) Apprendi

v. New Jersey, 530 U.S. 466 (2000), which requires that, other than the fact of a

prior conviction, any fact that increases the penalty for a crime beyond the

prescribed statutory maximum be submitted to a jury and proved beyond a

reasonable doubt; and (2) Harris v. United States, 536 U.S. 545, 567-68 (2002),

which held that judicial factfinding that increased the applicable statutory

mandatory-minimum sentence was permissible under the Sixth Amendment.

Alleyne, 133 S. Ct. at 2157-58. In Alleyne, the Supreme Court expressly

overturned Harris because it was inconsistent with its decision in Apprendi, and

held that any facts that increase the applicable statutory mandatory-minimum

sentence for a crime must be submitted to a jury and found beyond a reasonable

doubt. Id. at 2155, 2163.

The MDLEA expressly provides that the United States's jurisdiction over a

vessel is not an element of the offense, and that jurisdiction is a preliminary

question of law to be resolved by the district court. 46 U.S.C. § 70504(a)

("Jurisdiction of the United States with respect to a vessel subject to this chapter is

not an element of an offense. Jurisdictional issues arising under this chapter are

13

preliminary questions of law to be determined solely by the trial judge."). In

Tinoco, we asked whether the MDLEA jurisdictional requirement raised "factual

questions that traditionally would have been treated as elements of an offense

under the common law, thereby triggering the constitutional safeguards provided

by the Due Process Clause and the Sixth Amendment right to a jury trial." 304

F.3d at 1107-08.  Analyzing the common law, we held that the MDLEA's

jurisdictional requirement does not raise a factual issue that, under the common

law, would have been considered an element of the offense. Id. at 1108.  This is

because the jurisdictional requirement is intended to act as a diplomatic courtesy,

and does not bear on the individual defendant's guilt. Id. at 1108-09.  Therefore,

because the jurisdictional requirement under the MDLEA is not an element of the

offense, neither the Due Process Clause nor the Sixth Amendment to the

Constitution are implicated when the jurisdictional requirement under the MDLEA

is not proven to the satisfaction of a jury. Id. at 1111-12.

     As an initial matter, we review Cruickshank's Confrontation Clause

argument for plain error because he failed to raise it at any time before the district

court, although we review his Alleyne argument de novo, since he raised that one

in the district court.  But under any standard of review, plain or otherwise, there

was no Confrontation Clause violation.  A United States Department of State

certification of jurisdiction under the MDLEA does not implicate the

Confrontation Clause because it does not affect the guilt or innocence of a defendant. Campbell, 743 F.3d at 809.  Nor did the district court err by rejecting Cruickshank's Alleyne argument, since we've squarely held the jurisdictional requirement is not an element of the offense, need not be determined by a jury, and does not violate the Due Process Clause or the Sixth Amendment. 46 U.S.C. § 70504(a); Tinoco, 304 F.3d at 1108, 1111-12. These claims are without merit.

IV.

As for Cruickshank's last claim, however -- that the district court erred in denying him a minor-role reduction under U.S.S.G. § 3B1.2(b) -- we are compelled to vacate and remand for resentencing.  We review a district court's denial of a role reduction for clear error. United States v. Bernal-Benitez, 594 F.3d 1303, 1320 (11th Cir. 2010).  Clear error review is deferential, and "we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed." United States v. Ghertler, 605 F.3d 1256, 1267 (11th Cir. 2010) (quotations omitted).  The district court's "choice between two permissible views of the evidence" as to the defendant's role in the offense will rarely constitute clear error "[s]o long as the basis of the trial court's decision is supported by the record and does not involve a misapplication of a rule of law." United States v. De Varon, 175 F.3d 930, 945 (11th Cir. 1999) (en banc) (emphasis and quotation omitted).  The defendant bears the burden of establishing his minor

15

role in the offense by a preponderance of the evidence. <u>Bernal-Benitez</u>, 594 F.3d at 1320.

The Sentencing Guidelines provide for a two-level decrease to a base offense level if a defendant was a minor participant in the criminal activity. U.S.S.G § 3B1.2(b). A minor participant is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." <u>Id</u>., cmt. n.5. Our leading case concerning the minor-role reduction -- <u>De Varon</u> -- has long instructed sentencing courts analyzing a claim for a minor-role reduction to consider "first, the defendant's role in the relevant conduct for which [he] has been held accountable at sentencing, and, second, [his] role as compared to that of other participants in [his] relevant conduct." 175 F.3d at 940. As the en banc Court explained in <u>De Varon</u>, "[t]hese principles advance both the directives of the Guidelines and our case precedent by recognizing the fact-intensive nature of this inquiry and by maximizing the discretion of the trial court in determining the defendant's role in the offense." <u>Id</u>. at 934.

In <u>De Varon</u>, the defendant was a drug courier -- she had ingested and smuggled 70 heroin-filled pellets into the United States from Colombia. <u>Id</u>. We recognized that "when a drug courier's relevant conduct is limited to her own act of importation, a district court may legitimately conclude that the courier played an important or essential role in the importation of those drugs." <u>Id</u>. at 942-43.

16

However, we declined to "create a presumption that drug couriers are never minor or minimal participants, any more than that they are always minor or minimal"; rather, we held that "the district court must assess all of the facts probative of the defendant's role in her relevant conduct in evaluating the defendant's role in the offense." Id. at 943. We offered examples of relevant factors for the court to consider, including the "amount of drugs, fair market value of drugs, amount of money to be paid to the courier, equity interest in the drugs, role in planning the criminal scheme, and role in the distribution." Id. at 945. We stressed that this is "not an exhaustive list," nor is "any one factor . . . more important than another," especially since the determination is highly fact-intensive and "falls within the sound discretion of the trial court." Id. The en banc Court in De Varon ultimately concluded that it was well within the sentencing court's discretion to deny the minor-role adjustment to the defendant, after it determined that De Varon was central to the importation scheme, that she had carried a substantial amount of high-purity heroin on her person, that it was unclear from the record that she was less culpable than the other described participant in the scheme, and that De Varon had furnished $1,000 of her own money to finance the smuggling enterprise. Id. at 945-46.

The Sentencing Commission, through Amendment 635 to the Sentencing Guidelines, adopted our approach in De Varon that "§ 3B1.2 does not

17

automatically preclude a defendant from being considered for a mitigating role adjustment in a case in which the defendant is held accountable under § 1B1.3 solely for the amount of drugs the defendant personally handled." See U.S.S.G. App. C, Amend. 635, Reason for Amendment. As the Commission explained, "[i]n considering a § 3B1.2 adjustment, a court must measure the defendant's role against the relevant conduct for which the defendant is held accountable at sentencing, whether or not other defendants are charged." Id.

More recent amendments to the Sentencing Guidelines -- that went into effect after the sentencing hearing in this case -- further clarify the factors for a court to consider for a minor-role adjustment, and still continue to embrace the approach we took in De Varon. In November 2015, the Commission added the following language to Application Note 3(C) for § 3B1.2:

> In determining whether [a defendant warrants a minimal or minor participant] or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:
>
> (i)   the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii)  the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv)  the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the

18

defendant performed and the responsibility and discretion
the defendant had in performing those acts;

(v)      the degree to which the defendant stood to benefit from the
criminal activity.

For example, a defendant who does not have a proprietary interest in
the criminal activity and who is simply being paid to perform certain
tasks should be considered for an adjustment under this guideline.

The fact that a defendant performs an essential or indispensable role
in the criminal activity is not determinative.  Such a defendant may
receive an adjustment under this guideline if he or she is substantially
less culpable than the average participant in the criminal activity.

U.S.S.G. Supp. App. C, Amend. 794.  Not surprisingly, this non-exhaustive list of

factors includes many of the same factors we delineated in De Varon, including the

defendant's role in planning and carrying out the scheme, as well as the amount the

defendant stood to be paid.  De Varon, 175 F.3d at 945.

Although this Court applies the version of the Guidelines in effect on the

date of sentencing, when reviewing the district court's application of the

Guidelines, we consider clarifying amendments retroactively on appeal regardless

of the date of sentencing.  United States v. Jerchower, 631 F.3d 1181, 1184

(11th Cir. 2011).  As we've explained, an amendment to the commentary, and not

the text, of the Guidelines "suggest[s] that it clarifies" the guideline "rather than

substantively alters it."  Id. at 1187.  Thus, the government in this case argues

correctly that Amendment 794 merely clarified the factors to consider for a minor-

role adjustment, and did not substantively change § 31B.2.  Accord United States

v. Quintero-Leyva, 823 F.3d 519, 523 (9th Cir. 2016) (holding Amendment 794 was intended as a clarifying amendment and it therefore applies retroactively on direct appeal). The Sentencing Commission, moreover, did not describe Amendment 794 as making a substantive change, but stated that it provides "additional guidance to sentencing courts." See U.S.S.G. Supp. App. C, Amend. 794, Reason for Amendment. In other words, Amendment 794 merely explains the meaning of the terms in the original guideline. See Jerchower, 631 F.3d at 1184.

Our task, therefore, is to review the district court's ruling in light of the Guidelines, our case law, and clarifying Amendment 794. For starters, we note that the evidence at trial painted a fairly full picture of the role that Cruickshank took in the offense -- among other things, he was involved in programming the vessel's route, in evading authorities, and in obstructing the Coast Guard's inquiry. Moreover, the record makes clear that the district court discussed many of the factors our Court and the Sentencing Commission have laid out as important to the minor-role determination. These factors included the quantity of drugs Cruickshank transported, Cruickshank's expectation of "premium pay," Cruickshank's role as one of only two people on board to take the vessel from Colombia to Jamaica, and the dangerousness of the offense of "transport[ing] a large cargo of contraband in a transoceanic voyage from one continent to another" -- a "voyage [that] necessitate[d] the intervention of the United States military to

defeat it," and that intentionally or unintentionally endangered many lives.  DE101 at 17-19.

However, one portion of the district court's decision gives us pause -- its suggestion that the quantity of cocaine being transported on the Venus was so large that no participant in the scheme could ever have been eligible for a minor-role reduction.  At one point the court said that the quantity of drugs was "so large that any participant in [the case] can't be said to be engaged in minor activity."  DE101 at 14.  Later, it reiterated that "171 kilograms of high-quality cocaine, almost pure cocaine in this circumstance, that will be, as the druggies say, stepped on two or three or four times is not even available for a minor role under the language of Rodriguez De Varon."  DE101 at 18 (emphasis added).  But De Varon stressed the fact-intensive nature of the inquiry, and the sentencing court's role in assessing the totality of the circumstances, where no one factor is "more important than another."  175 F.3d at 945; id. at 943 ("[T]he district court must assess all of the facts probative of the defendant's role in her relevant conduct in evaluating the defendant's role in the offense.") (emphasis added).[1]  Moreover, Amendment 794

---

[1]     While the Court indicated in De Varon that we would not "foreclose the possibility" in a drug courier case "that amount of drugs may be dispositive -- in and of itself -- in the extreme case," we allowed for that possibility because "the amount of drugs in a courier's possession -- whether very large or very small -- may be the best indication of the magnitude of the courier's participation in the criminal enterprise."  175 F.3d at 943.  De Varon involved a defendant who had swallowed the contraband to transport it, so the amount in her possession was actually on her person and perhaps was more likely to be indicative of her relative role in the offense.  But this is not that kind of case.  Here, there is nothing in the record to suggest that the amount of drugs was

clarified that a defendant could be considered for a minor-role adjustment in many circumstances, none of which turn on drug quantity. See, e.g., Amendment 794 (A defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks "should be considered for an adjustment under this guideline.") (emphasis added); id. (A defendant who performed an essential or indispensable role in the criminal activity "may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity.") (emphasis added).

Indeed, although nothing in De Varon or Amendment 794 precludes a district court from considering the drug quantity with which the defendant was involved as an indicator of his role, we think it was legal error for the district court to say that this is the only factor to be considered in a case like this one. While it is possible that the district court did not rely solely on drug quantity in making its minor-role determination, the consequences for Cruickshank's advisory sentencing range could be significant -- a potential six-level reduction to his offense level, see U.S.S.G. §§ 2D1.1(a)(5), 3B1.2(b). Thus, we think the wisest course of action is to vacate the district court's decision and remand for resentencing. On remand, the district court should perform an inquiry based on the totality of circumstances,

---

indicative of the magnitude of Cruickshank's participation in the crime -- to the contrary, he did not load the drugs on the vessel, reconstruct the vessel, fuel the vessel, attend the planning meetings for the trip, or otherwise appear to have any role concerning the quantity of drugs aboard.

taking into account the variety of factors laid out in <u>De Varon</u> and

Amendment 794.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**